J. H. COTTMAN & Co. *v.* UNITED STATES (No. 3513)[1]
UNITED STATES *v.* J. H. COTTMAN & Co. (No. 3520)

United States Court of Customs and Patent Appeals, December 19, 1932

*Davis, Polk, Wardwell, Gardiner & Reed, Janney, Ober & Williams* (*John W. Davis, Stuart S. Janney,* and *Edwin F. Blair* of counsel) for importer.

*Charles D. Lawrence,* Assistant Attorney General (*Oscar Igstaedter,* special attorney, of counsel), for the United States.

*Carter, Ledyard & Milburn, Curtis, Fosdick & Belnap* (*L. R. Mason* and *James F. Curtis* of counsel) as *amici curiae.*

[Oral argument October 14, 1932, by Mr. Davis, Mr. Igstaedter, and Mr. Mason]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

Certain raw phosphate rock was imported by J. H. Cottman & Co. from Casablanca, Morocco, at the port of Baltimore in 1927 and 1928. This merchandise was exported by Office Cherifien des Phosphates, an agency of the Government of Morocco, of Rabat, Morocco, and, except as hereinafter mentioned, was free of duty under paragraph 1640 of the Tariff Act of 1922 as "phosphates, crude."

Upon importation of these goods the appraiser at the port, suspecting that the purchase price thereof was less than the foreign-market value, under authority of section 201 (b) of the Antidumping Act of 1921, 42 Stat. 11, the relevant portions of which act appear in a marginal note,[1] notified the Secretary of the Treasury of such fact and withheld appraisement. Thereafter, on February 9, 1928, the Secretary of the Treasury made a finding of dumping pursuant to said statute, which finding was duly promulgated. T. D. 42577, 53 Treas. Dec. 141.

---

[1] SEC. 201. (a) That whenever the Secretary of the Treasury (hereinafter in this Act called the "Secretary") after such investigation as he deems necessary, finds that an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation into the United States of a class or kind of foreign merchandise, and that merchandise of such class or kind is being sold or is likely to be sold in the United States or elsewhere at less than its fair value, then he shall make such finding public to the extent he deems necessary, together with a description of the class or kind of merchandise to which it applies in such detail as may be necessary for the guidance of the appraising officers.

(b) Whenever, in the case of any imported merchandise of a class or kind as to which the Secretary has not so made public a finding, the appraiser or person acting as appraiser has reason to believe or suspect, from the invoice or other papers or from information presented to him, that the purchase price is less, or that the exporter's sales price is less or likely to be less, than the foreign market value (or, in the absence of such value, than the cost of production) he shall forthwith, under regulations prescribed by the Secretary, notify the Secretary of such fact and withhold his appraisement report to the collector as to such merchandise until the further order of the Secretary, or until the Secretary has made public a finding as provided in subdivision (a) in regard to such merchandise.

SEC. 202. (a) That in the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the Secretary has made public a finding as provided in section 201, and as to which the appraiser or person acting as appraiser has made no appraisement report to the collector before such finding has been so made public, if the purchase price or the exporter's sales price is less than the foreign market value (or, in the absence of such value, than the cost of production) there shall be levied, collected, and paid, in addition to the duties imposed thereon by law, a special dumping duty in an amount equal to such difference.

(b) If it is established to the satisfaction of the appraising officers that the amount of such difference between the purchase price and the foreign market value is wholly or partly due to the fact that the wholesale quantities, in which such or similar merchandise is sold or freely offered for sale to all purchasers for exportation to the United States in the ordinary course of trade, are greater than the wholesale quantities in which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country of exportation in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States), then due allowance shall be made therefor in determining the foreign market value for the purposes of this section.

(c) If it is established to the satisfaction of the appraising officers that the amount of such difference between the exporter's sales price and the foreign market value is wholly or partly due to the fact that the wholesale quantities, in which such or similar merchandise is sold or freely offered for sale to all purchasers

Following this order the appraiser proceeded to appraise the merchandise in conformity with section 202 of said act, finding the purchase prices of the various importations to range from $4 to $5 per ton and the foreign-market values to range from $7.52 to $7.58 per ton on the date of exportation.

The importer thereupon appealed for reappraisement in each case. A trial of the consolidated reappraisements was had before Justice Sullivan of the United States Customs Court, who found that the merchandise was sold and freely offered for sale to all purchasers in the principal markets of Morocco in the usual wholesale quantities and in the ordinary course of trade for home consumption, all as provided by section 205 of said act, and the entered values were sustained. The foreign-market value so found by Judge Sullivan was the price paid by the superphosphate works hereinafter mentioned to Office Cherifien des Phosphates for crude phosphate, namely, $3.98 per ton.

On the hearing before Judge Sullivan certain documentary evidence was offered by the Government, marked as "collective Exhibit C." This consisted of three documents, namely: A vizerial decree of August 7, 1920, issued by the Cherifien Government of Morocco, creating the Office Cherifien des Phosphates; a decree of said Cherifien Government dated January 27, 1920, assuming governmental control of the phosphate deposits of Morocco; a vizerial decree of November

in the principal markets of the United States in the ordinary course of trade, are greater than the wholesale quantities in which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country of exportation in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States), then due allowance shall be made therefor in determining the foreign market value for the purposes of this section.

SEC. 203. That for the purposes of this title, the purchase price of imported merchandise shall be the price at which such merchandise has been purchased or agreed to be purchased, prior to the time of exportation, by the person by whom or for whose account the merchandise is imported, plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, less the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States; and plus the amount, if not included in such price, of any export tax imposed by the country of exportation on the exportation of the merchandise to the United States; and plus the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States; and plus the amount of any taxes imposed in the country of exportation upon the manufacturer, producer, or seller, in respect to the manufacture, production, or sale of the merchandise, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States.

SEC. 204. That for the purpose of this title the exporter's sales price of imported merchandise shall be the price at which such merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter, plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, less (1) the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States, (2) the amount of the commissions, if any, for selling in the United States the particular merchandise under consideration, (3) an amount equal to the expenses, if any, generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise, and (4) the amount of any export tax imposed by the country of exportation on the exportation of the merchandise to the United States; and plus the amount of any import duties imposed

26, 1921, made by said Cherifien Government, approving a contract thereto appended, between Mr. Tellière, a manufacturer, as one party, and the Cherifien Government and Office Cherifien des Phosphates as the other parties. Objection to the introduction of this collective exhibit was sustained by the court.

Application for review was made by the Government. The Customs Court, Third Division, affirmed the decision of Judge Sullivan, finding that there was a foreign-market value of the imported merchandise; that this value was $3.98 per ton; that this was less than the American purchase price, and that no dumping duties were assessable.

The Government appealed to this court, and the judgment of the Third Division was reversed because of error in the trial court in refusing to admit in evidence said collective Exhibit C, and the cause was remanded for a new trial by the single justice. *United States* v. *Cottman & Co.*, 18 C. C. P. A. (Customs) 132, T. D. 44095.

On a retrial by Judge Sullivan collective Exhibit C was admitted in evidence as collective Exhibit 19, an affidavit of Otto Carl Schmidt and the record in the original case were admitted in evidence, and the case was submitted. The court adhered to its former decision, and the cause was again taken on review to the said Third Division. Cline, Judge, held that the evidence in the record showed a controlled market; that there was no foreign-market value established as is provided in said section 205; that there was no cost of production

by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States; and plus the amount of any taxes imposed in the country of exportation upon the manufacturer, producer, or seller in respect to the manufacture, production, or sale of the merchandise, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States.

SEC. 205. That for the purposes of this title the foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States), plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States, except that in the case of merchandise purchased or agreed to be purchased by the person by whom or for whose account the merchandise is imported, prior to the time of exportation, the foreign market value shall be ascertained as of the date of such purchase or agreement to purchase. In the ascertainment of foreign market value for the purposes of this title no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account.

SEC. 206. That for the purposes of this title the cost of production of imported merchandise shall be the sum of— .

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing, identical or substantially identical merchandise, at a time preceding the date of shipment of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of identical or substantially identical merchandise;

(3) The cost of all containers and coverings, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2)) equal to the profit which is ordinarily added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the same general trade as the manufacturer or producer of the particular merchandise under consideration.

shown by the record, and that the appeal to the single judge should have been dismissed for failure to make sufficient proof. The judgment was reversed and the cause remanded for further proceedings consistent with the decision. Evans, Judge, concurred in the order but expressed the view that there was no evidence in the record of a foreign value of $7.58 a ton, as found by the appraiser in several of the reappraisements. He was also of the opinion that the cause should be remanded to permit the parties to prove cost of production. Judge Young dissented.

The matter is now brought to this court on cross appeals. The importer assigns error in the court below in finding no foreign-market value and in its order of reversal and remand. The Government, in its cross appeal, contends that the court should have found foreign-market value, consisting of the price at which such merchandise was sold at the time of exportation for exportation to countries other than the United States.

The record discloses the following facts: At the time of the various proceedings hereinafter mentioned a zone of the Cherifien Empire of Morocco constituted a French protectorate. On January 27, 1920, a decree was promulgated by the French resident general commissioner of this zone, reserving to the Government the prospecting and exploitation of phosphates. This decree, as well as the vizerial decrees hereinafter mentioned, are admitted to have had the force and effect of law. The phosphate deposits in issue are in the form of rock, averaging about 75 per centum phosphate of lime content.

On August 7, 1920, by a vizerial decree, the Cherifien Government created a governmental monopoly under the name of "Office Cherifien des Phosphates," which was given exclusive control of research development and exploitation of phosphates within the French protectorate. This governmental agency was given civil status and had a director general and a board of directors, on which board, among others, were representatives of the Cherifien Government. The operations and organization personnel were all subject to approval by the Government of Morocco, and all were required to be reported to the Government from time to time. The finances of this governmental agency were provided from three sources, namely, a money grant by the Government, a special reserve fund created from profits, and by an issue of bonds, guaranteed by the Government. The profits of the Office Cherifien were to be utilized as follows: To pay the management and staff, to build up a reserve fund, and to transfer the balance to the Cherifien treasury.

In order to develop the phosphate industry the Office Cherifien des Phosphates, on November 26, 1921, entered into a contract with Mr.

Tellière for the construction of a superphosphate factory, which contract was duly approved by the Cherifien Government. The contract appears in a marginal note.[2] At the times of exportation of the merchandise here involved there was but this one factory in Morocco to which the office sold crude phosphate. There had been some steps taken toward establishing others, and the office had offered to make similar terms to those agreed upon with Mr. Tellière, but the factories had not been built.

The Office Cherifien des Phosphates since its creation has sold crude phosphates to three classes of purchasers: First, to farmers of Morocco, who could use it only for their own personal uses, and could not resell or export it; second, to the superphosphate works of Mr. Tellière, where it must be used in making superphosphate and could not be sold or exported; third, to foreign countries. In some cases sales were made to farm cooperatives, who resold to the members. The same restrictions about use, however, existed in such sales, as indicated by the following answers of the witness De Bailliencourt-Courcol:

---

[2] Contract respecting the construction of a superphosphate factory between Mr. Tellière, Ange, manufacturer, of Paris, 28 Rue de Chateaudun, acting in his own name, of the one part, and Messrs. Delpit, director general of public works in Morocco, representing the Cherifien Government, and Beaugé, director general of the Office Cherifien des Phosphates, of the other part: It is agreed as follows:

ARTICLE 1. Mr. Tellière gives the undertaking to the Cherifien Government of constructing at Casablanca and putting into operation within two years, dating from the ratification of present contract by vizerial decree, a factory with a minimum annual capacity of production of 24,000 tons of superphosphate.

The specifications proposed must be presented to the Government within six months after ratification.

ART. 2. Mr. Tellière undertakes to form within six months dating from the ratification of the present contract with French or Moroccan shareholders a limited liability company under French or Moroccan law which will supersede him in the execution of this contract.

The articles of association of this company are to be subject to the approval of the Cherifien Government and can not be altered without its sanction.

The voting majority at the general meetings shall be formed by nominative shares, which can not be transferred without the approval of the board of directors of the company.

ART. 3. The Cherifien Government undertake to deliver on the following conditions each year, at the request of the manufacturer, the necessary phosphate for the working of his factory, namely, 15,000 tons.

The annual tonnage could be increased to 30,000 tons after the opening of the normal gage railway to the mines and to 50,000 tons three years later. Any quantity of phosphate exceeding 50,000 tons required by the company for manufacture in its factories, for requirements in Morocco, will be delivered in priority by the Office des Phosphates or any other organization authorized by the Cherifien Government.

It is agreed that this phosphate will be of average grade not lower than that of the phosphate usually exported and the price per ton shall not be above the average selling price in Morocco.

Mr. Tellière is not allowed to sell or export raw phosphate. The total quantity which may be delivered under the present contract must be manufactured in Morocco.

ART. 4. Deliveries will be made on wagon at the loading railroad station.

Failing a contract between the company, and the Office des Phosphates or other authorized organization, the sale price of the phosphate will be established by deducting from the average price for the preceding year (at quay Casablanca) of phosphate delivered to French manufacturers, the cost of transport and other charges from the railroad station to the quay at Casablanca.

ART. 5. Mr. Tellière undertakes to give prior delivery of superphosphate produced at his works to farmers of Morocco and at a price calculated at the factory not exceeding the average selling price of superphosphate of similar grade bought by farmers at factories in France.

ART. 6. In order to encourage the production in Morocco of superphosphate necessary for Moroccan agriculture, a reduction in price will be made on the supply of phosphate necessary for this purpose.

This reduction is to be made on the price of phosphate at the railroad station at the mine, calculated as stated in article 4.

Q. Now, during this period has the O. C. P. offered this phosphate for such use, domestic use, freely at this price?—A. During the whole year we sell to other farmers at the same price, and upon their request for their own personal use.

\*     \*     \*     \*     \*     \*     \*

Q. Now, what restrictions were there to the phosphates that were sold to the farmer?—A. None whatever, except that they must use the phosphate at home.

There were no domestic purchasers but farmers and the superphosphate works, and to these, in 1927, the following amounts were sold: To farmers, 501 tons, at $3.50 per ton; and to the superphosphate works, 12,760 tons, at $3.98 per ton.

When rock phosphates were sold for export to foreign countries by the office, this was done as to each country except three, with a contract that the phosphates must be consumed in the works of the buyers and could not be resold. The three exceptions were the United States, Japan, and Australia and New Zealand, the two latter being represented by one purchasing agency. In these countries the buyers were permitted to resell the crude phosphate, but only for consumption in those countries. There is some confusion in the testimony of De Bailliencourt-Courcol as to the conditions of sales to Japan which will be hereinafter referred to. The Cherifien Government

It will apply to phosphate necessary for the manufacture of superphosphate delivered to farmers in Morocco, and up to the annual quantity of 50,000 tons of phosphate. Up to the 31st December, 1934, it will be 30% on the price of phosphate at the railroad station, and after that date and until the 31st December, 1945, it will be reduced to 15%.

It is further agreed that during the period from the commencement of operation up to the 31st December, 1934, this reduction will apply to the tonnage necessary for the working of the first factory up to a maximum of 15,000 tons. This maximum may be increased during the same period to 30,000 tons after annual deliveries of superphosphate to Moroccan farmers have reached 15,000 tons. After the 31st December, 1934, the reduction will only apply to phosphate consumed for the manufacture of superphosphate used in Morocco.

ART. 7. In order to meet the cost of sinking funds due to the present increase in cost of construction of the factory, Mr. Tellière will be granted—

(1) Reimbursement of customs dues and special tax of 2½% paid on raw material imported and employed for superphosphate which will be reexported.

(2) An annual subsidy of—

(a) A sum equivalent to the customs dues and special tax of 2½% on raw material imported and used for superphosphate delivered in Morocco.

(b) A fixed subsidy of Fr. 150,000, which will be paid annually for five years, commencing on the 1st January following the commencement of working of the factory.

In the event of the Office des Phosphates or any other organization authorized by the Cherifien Government being required to give rebates in favor of farmers in Morocco on superphosphate manufactured in Morocco, it is agreed that such advances for these rebates will be deducted without interest from the amounts due by the company for phosphate received.

The protectorate will group as far as possible the deliveries of phosphate to the company, in order that the company may secure the benefit of the lowest railroad rates.

ART. 8. The average price of phosphate and superphosphate specified in the preceding articles will be agreed for each preceding year. Each interested party shall communicate to the other all information and relative evidence.

In the event of disputes the estimation of the average selling price of superphosphate in France can be submitted for determination by the Association of Sworn Brokers of the Seine.

ART. 9. The present agreement will terminate on the 31st December, 1945. Any dispute which may arise in operation, especially having reference to the determination of prices, will be settled by arbitration. For this purpose the Cherifien Government and the company will each select an arbitrator. In the event of these two arbitrators not agreeing on an award, a third arbitrator, whose decision shall be final, will be appointed by them, or in the event of disagreement as to this appointment, by the president of the court of appeal of Rabat.

required such restrictions. These restrictions were made, as stated by Max De Bailliencourt-Courcol, commercial director of the office, "because the office wants to control constantly the market."

To carry out this purpose sales were made to various countries at varying prices. In Italy but one company, the Montecatine, a trust, could buy; in South Africa, the Imperial Chemical Industries was the only buyer; in Australia and New Zealand, the British phosphate commissioners. The record is not clear as to sales to other countries, but all were conditional as before stated. The testimony shows that the prices at which this rock phosphate was sold during the period here in issue, in countries other than Morocco and the United States, ranged from $7.51 to $7.89 per long ton of 2,240 pounds. While the f. o. b. price at Casablanca to European countries during that period was, approximately, $6 per long ton, to Japan it was $4.50 and to the United States about $4.95 per long ton.

From this rather extended review of the facts, it appears that the phosphate industry of the French protectorate in Morocco is a governmental monopoly, subsidized by governmental funds and subject to governmental control in production, sale, and price fixation. Not only does this governmental control exist in Morocco, but it follows the product into foreign lands and controls and limits its sales there. Not a pound of Moroccan phosphate can be sold in any country except under conditions imposed or approved by the Cherifien Government.

When this matter was before us in the first instance, in *United States* v. *Cottman & Co., supra*, we said:

> While the court made a finding of fact of the foreign-market value of the phosphate rock involved herein of $3.98 per ton, we think it is clear from the foregoing quotation that in making such finding the court rejected sales made direct to farmers and farmer cooperative organizations as a proper basis for determining foreign-market value. We are of the opinion that such rejection was justified, and that the sales to farmers and farmer cooperative organizations, under the terms and conditions disclosed by the record, do not constitute any substantial evidence of foreign-market value.

In his dissenting opinion filed in that case, Garrett, J., expressed his view that a consideration of that question was not essential to a judgment in the case as then presented. Counsel for the importer here, also, take the position that what we there said on the question of foreign value was *obiter* and should not be here considered as conclusive upon the court.

The issue is somewhat confused by the claims and concessions of the parties made in the course of this litigation. In the trial court, on retrial, the following concession was made by counsel for importer:

> Mr. JANNEY. We are not contending before your honor for the price to farmers. We are contending that the price at which this 12,000 tons was sold to the factory, and it is the same thing which was offered to any other factory, and for the reasons set forth in your honor's opinion and in the opinion of the Third Division.

the only ones who passed on the merits in the matter, we believe ought to contro
in this case.    I feel that I can submit the case with those comments.

\*      \*      \*      \*      \*      \*      \*

Mr. IGSTAEDTER.  So that there will be no misunderstanding, is it correct, Mr.
Janney, that the importers no longer contend that sales to farmers or sales to
farmers' cooperative organizations establish the foreign-market value?

Mr. JANNEY.  No; I do not contend that.

This seems to have been the theory upon which the case was retried
in the trial court.    Here, however, counsel for the importer are con-
tending that error was committed by the court below in not finding
that such sales to farmers and farm cooperatives constituted foreign-
market value; also, that while the sales to farmers, farm coopera-
tives, and the superphosphate works, are evidence of foreign-market
value, the sales to all foreign countries except Japan, United States,
Australia, and New Zealand, were controlled and did not constitute
foreign-market value.    On the other hand, the Government is con-
tending that the sales to the farmers, farm cooperatives, and super-
phosphate works are controlled and constitute no foreign-market
value, but that the sales to foreign countries were not in a controlled
market and did constitute proof of foreign-market value.

In view of the importance of the issues presented, we deem it
advisable to state our views on the various issues presented, irrespec-
tive of the somewhat confused state of the record which might, under
other circumstances, be held to preclude consideration of some of
them.

Section 205 of the antidumping act prescribes two methods of
ascertaining the foreign-market value of merchandise: First, the price
at time of exportation at which such or similar merchandise is sold or
freely offered for sale to all purchasers in the principal markets of the
country from which exported in the usual wholesale quantities and in
the ordinary course of trade for home consumption; second, the
price at time of exportation of such merchandise at which such or
similar merchandise is sold or freely offered for sale to all purchasers
in the principal markets of the country from which exported in the
usual wholesale quantities and in the ordinary course of trade for
exportation to countries other than the United States.    The first
method shall be followed if such price exists.    Either, however, con-
stitutes foreign-market value under this section.

It will be observed that several elements enter into a consideration
of foreign-market value under said section 205.    First, the merchan-
dise or goods similar thereto must be *sold* or *freely offered for sale* to all
purchasers.    Second, the goods must be so sold or offered *in the ordi-
nary course of trade*.    Third, it must be so sold or offered for *home con-
sumption*, or, in the alternative, for exportation to countries other than
the United States.

It should first be observed that the statute, as one element of foreign-market value, uses the term "for home consumption." In view of the apparent conflict of opinion as to the meaning of this term, in the court below, we deem it proper to state our view as to the proper construction of said language. Webster's New International Dictionary, 1932, thus defines the word "consumption":

1. Act or process of consuming; state of being consumed; waste; decay; destruction.

"Home consumption," therefore, means, in this case, the destruction of the rock phosphate in Morocco; it is as much a destruction of the material when it is transmuted into plant food as when it is changed, by mechanical and chemical processes, into superphosphate, and vice versa. A use, and consequent destruction, of the material in manufacturing another product in Morocco, in our opinion, is a "home consumption" in Morocco.

We have at various times considered the legal meaning of the terms "sold or freely offered for sale" and "the ordinary course of trade," in similar statutes. *Goodyear Tire & Rubber Co.* v. *United States,* 11 Ct. Cust. Appls. 351, T. D. 39158; *Kuttroff, Pickhardt & Co.* v. *United States,* 12 Ct. Cust. Appls. 299, T. D. 40313; *United States* v. *Davies, Turner & Co.,* 13 Ct. Cust. Appls. 547, T. D. 41430; *United States* v. *Int. Forwarding Co.,* 13 Ct. Cust. Appls. 579, T. D. 41436; *United States* v. *Richard & Co.,* 15 Ct. Cust. Appls. 143, T. D. 42216; *Meadows, Wye & Co.* v. *United States,* 17 C. C. P. A. (Customs) 36, T. D. 43324; *United States* v. *H. W. Robinson & Co.,* 19 C. C. P. A. (Customs) 274, T. D. 45436.

The leading case on the subject is *Goodyear Tire & Rubber Co.* v. *United States, supra.* We were there considering the language, "freely offered for sale to all purchasers in said markets, * * * in the ordinary course of trade," found in paragraph R, Section III, of the Tariff Act of October 3, 1913, a part of the statutory definition of actual market value, as fixed by said paragraph. In that case tires were manufactured in Canada and were distributed to various selected agencies, jobbers, and dealers in Canada. The territory within which each dealer in Canada might operate was fixed and the price at which he might sell was controlled by the manufacturer. Only certain manufacturers, jobbers, and dealers might buy.

This court held that such a condition did not satisfy the statutory requirement of a free offer to sell but because of these conditions constituted restricted and controlled sales or offers to sell; that it did not constitute the "ordinary course of trade," although it might have been the ordinary course of trade in Canada in that particular product. As to this, we said:

It may be that a manufacturer's control of sales and distribution from the time they leave his factory until they reach the ultimate consumer is the "ordinary

course of trade" for the marketing of *his* merchandise, but we are not prepared to admit that it is the ordinary course of trade for supplying consumers with tires or other goods. In other words, price-fixing and restriction of distributing agencies may be the ordinary course of trade in Canada for the furnishing of *Goodyear* tires to the public, but it can hardly be said that it is the ordinary course of trade for the marketing of automobile tires or for the marketing of merchandise in general.

Again we said:

* * * Indeed, if prices fixed by the manufacturer in markets restricted and absolutely controlled by him constitutes market value within the intention of paragraph R, Section III, then the phrase "freely offered for sale to all purchasers" becomes utterly meaningless. More than that, if fixed prices in such a restricted market be actual market value, then the manufacturer who fixes prices and controls the market has the power to make a market value to his liking and thereby determine in some measure the duties to be paid on his product—a power which might well be exercised not to protect jobbers, dealers, and consumers, as in this case, but to reduce duties on goods manufactured largely or wholly for foreign consumption.

That rule, based, we believe, on reason, has been developed and applied in the subsequent cases above cited. In *Kuttroff, Pickhardt & Co.* v. *United States, supra*, speaking of the American selling price and the United States value of merchandise, under section 402, Tariff Act of 1922, we said:

* * * Individuals, firms, or corporations having a monopoly of some particular commodity can not establish the statutory American selling price by special factitious offerings or by sales to controlled or favored purchasers or by transfers of less than the usual wholesale quantities or by transactions in a market not recognized by the trade and not developed in the ordinary course of business.

In *United States* v. *Int. Forwarding Co., supra*, we said:

It will be observed that the statute provides that the merchandise must be freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade. Accordingly, the prices at which merchandise is sold to a limited number of favored purchasers, or to the retail trade only, in quantities greater or less than the usual wholesale quantities, would not be proper evidence of the market value of such merchandise. Such price are not those at which such merchandise is *freely* offered for sale to *all purchasers*, in the *usual wholesale* quantities and in the *ordinary course of trade.*

In *United States* v. *Richard & Co., supra*, we expressed the opinion that goods were not freely offered for sale when they were sold only to certain purchasers who had satisfied the sellers that they were wholesalers.

A similar holding was made in *United States* v. *Robinson, supra.*

In *Meadows, Wye & Co.* v. *United States, supra*, we held that sales limited to those who would agree to resell at prices fixed by the manufacturer did not constitute a free offer to sell.

It is argued, however, that these cases announce a rule to be applied only where sales are made to a limited number of purchasers, and the rule ought not to be held to apply to sales made to anyone where the only restriction is as to use, such as that now before us.

It is true that we have not found any case the exact parallel of the one now at bar. However, we are unable to see any real distinction, in principle, between a market controlled as to price and one controlled as to the use of the merchandise. The statute with which we are dealing recites that, to constitute foreign-market value, the goods must be "sold or freely offered for sale." This expression should be given its ordinary meaning. The word "sale" is thus defined by Webster's New International Dictionary, 1932:

1. Act of selling; a contract whereby the absolute, or general, ownership of property is transferred from one person to another for a price, or sum of money, or, loosely, for any consideration; * * *.

Such, also, is the usual meaning given to it by the courts, unless by accompanying language, some other meaning is evidently intended. *Citizens Banking Co.* v. *Ravenna National Bank*, 234 U. S. 360; *Butler* v. *Thomson et al.*, 92 U. S. 412; *Five Per Cent Cases*, 110 U. S. 471, 478. A sale, according to Blackstone, is a transmutation of property from one man to another in consideration of some price or recompense in value. 2 Bl. Com. 446.

If we measure the transactions between the Office Cherifien des Phosphates and those with whom it did business, as shown by this record, we find they fall short of being sales, as thus defined. The phosphate rock received by farmers and farm cooperatives in Morocco could not be sold and must be used in Morocco by the individual receiving it. Here there was, at best, but a conveyance for a limited and restricted use.

The same may be said of the sales to the superphosphate works. The rock phosphate which this company obtained could not be resold or exported. Nothing could be done with it but to manufacture it into superphosphate, and then only on condition that the factory offer it first to farmers of Morocco at a certain stipulated price. As a part of this transaction the Government was to pay to the superphosphate works a direct subsidy, taken from the governmental treasury. Many other conditions were attached which are fully disclosed by the contract. It is quite evident that such transactions did not constitute sales under this statute.

The sales to European countries were almost equally restricted and limited. As we have before noted, such sales were upon condition that the rock phosphate must be consumed in the works of the buyers and could not be resold. These conditions followed the merchandise into foreign countries and must, inevitably, have affected its price and its value in the trade and commerce of both the country of export and of import. These sales, likewise, can not be taken as establishing foreign-market value. It may also be remarked that, in so far as this record shows, sales in these countries were to certain specified individuals only. This was also true in South Africa and in Australia and New Zealand.

It is contended by the importer that if sales for home consumption and sales to other foreign countries may be said to be in a controlled market, those to Japan were not, and the Japanese selling price being shown to have been lower than the United States selling price, no dumping duties may be legally applied.

It will be borne in mind that this is a reappraisement appeal and that the court below found that there was no foreign-market value shown by the record. If there be any substantial evidence in the record in support of such finding, it will not be disturbed. *United States* v. *Malhame*, 19 C. C. P. A. (Customs) 164, T. D. 45276. In other words, if there be any substantial evidence in the record that such sales to Japan were restricted, and conditional sales such as we have hereinbefore stated do not establish a foreign-market value, then the judgment of the court below, in that respect, must stand.

The record discloses that when the witness De Bailliencourt-Courcol was on the stand, the following occurred:

Q. These restrictions are always imposed?—A. For all the foreign markets except three.

Q. And what are those three?—A. The United States, Japan, and Australia and New Zealand.

\* \* \* \* \* \* \*

Q. Now, what are the restrictions imposed in the three cases you have mentioned?—A. In these countries the sales are made to merchants who have no works. We permit them therefore to resell, but only for consumption in the country for which the sales have been made.

While the witness later made a statement that the written contract made with the Japanese purchaser did not prevent him from reselling this phosphate rock outside of Japan, we are of opinion that the quoted testimony was some substantial evidence that the sales to Japan were so restricted and controlled as to take them out of the class which we have said would establish foreign-market value.

Foreign-market value, in our opinion, as defined in this statute was intended by the Congress to mean such conditions as exist in a free, open, unrestricted market, where people meet under normal competitive conditions to buy and sell their goods.

Finally, we have for consideration the matter of cost of production. It is argued by counsel for the importer that cost of production, under this statute, has been shown by collective Exhibit 5, which is as follows:

We, the subscribers, Max De Bailliencourt, director commercial of the Office Cherifien des Phosphates, and Rene Lambert, chief cashier of the O. C. P., declare under oath that the expenses of exploitation of the O. C. P. amounted to, in the year 1927, the sum of 118,387,869.72 francs for a tonnage extracted of 1,442,379 tons of 1,000 kilos; that the expenses of exploitation include all the costs from the extraction from the mine up to delivery on board of exporting vessels, including expressly the general cost of exploiting and direction, extraction, maintenance, transportation to Casablanca, and loading on board vessels, this

record according to the books of the Office Cherifien des Phosphates for the year 1927. It results from the above declaration that the net price works out for the year 1927 at 82.08 francs per ton of 1,000 kilos.

Done at Casablanca, Morocco, April 23, 1928.

(Signed)       LAMBERT.

BAILLIENCOURT.

The Government contends it does not show such cost of production, especially in its claimed failure to show the cost of the materials used and the allowance for profit, all as fixed by said section 206. The importer replies to this that even if there be added to the cost of production named in this exhibit the minimum of 8 per centum for profit fixed by the section, or if the profit on Japanese sales be added to such cost, the cost of production will still be lower than the price charged to the American purchasers. As to the cost of material, the importer argues that this cost the Office Cherifien des Phosphates nothing and that, therefore, there is no such element to be considered.

It appears that the Government of the French protectorate of Morocco has elected to go into the private business of its producing and selling rock phosphate. This any government may do, if, as the result of an economic or political policy, it finds it wise to do so. When it does so, however, it must be measured by the same standards which obtain when private individuals deal with each other. This is true whether it acts directly or through the instrumentality of governmental corporations. *United States* v. *Strang*, 254 U. S. 491; *Standard Oil Co.* v. *United States*, 267 U. S. 76; *Skinner & Eddy Corp.* v. *McCarl*, 275 U. S. 1.

The Cherifien Government has taken possession of the rock-phosphate mines of the country, declaring a governmental monopoly therein. Whether the lands and mines constituted a part of the public domain or whether they were taken by the Government after payment to the owners thereof does not appear. Certainly the product of these mines has a value, for it finds ready sale. The government, however, by its rights of sovereignty and possessing the right of taxation with which it may maintain itself and acquire and hold these valuable deposits, claims that it should have the right to include these materials as costing nothing.

No individual could do business in this way. It is quite impossible to conceive of a situation where a private individual might obtain a monopolistic ownership and control of some natural product without some expenditure of labor or money, which would constitute the cost, to him, of his product. When a government does this, it does so because of sovereign power, its right to take private property, its maintenance of armies and executive establishments, its right to tax its people. No just comparison can be made between the cost of material to the individual and to the government in such cases. There was no cost of material shown by collective Exhibit 5, and this we

hold must be done. If it be said that the cost of material is incapable of ascertainment under such conditions, then no cost of production can be shown under this statute because of the absence of this statutory element therein.

It has been suggested that such a construction will produce difficulties in the proper administration of the so-called flexible-tariff provisions of the Tariff Act of 1930.

The issues before the court involve a construction of the Antidumping Act of 1921, not the flexible-tariff provisions of the Tariff Act of 1930. However, it may be observed that, although section 336 (h) (4) of the latter act includes in the definition of the term "cost of production" of either foreign or domestic articles the "price or cost of materials," section 336 (e) provides that, in ascertaining the differences in costs of production of domestic and similar or like foreign articles, the Tariff Commission "shall take into consideration, in so far as it finds it practicable," the cost of production as defined in section 336 (h) (4). Should the commission find, however, that such cost of production is "not readily ascertainable," it may—

accept as evidence thereof, or as supplemental thereto, the weighted average of the invoice prices or values for a representative period and * * * other relevant factors that constitute an advantage or disadvantage in competition, including advantages granted to the foreign producers by a government, person, partnership, corporation, or association in a foreign country.

It is clear from the quoted provisions that the Congress contemplated that the Tariff Commission would meet with difficulties, possibly insurmountable, in executing the law if it were limited to the ascertainment of costs of production as defined in section 336 (h) (4). Accordingly, the Congress provided that the Tariff Commission should not be so limited.

These considerations do not make doubtful, but rather confirm, the correctness of our construction of the Antidumping Act of 1921.

In collective Exhibit 5 it will be noted that no allowance is made for profit. This is required by said section 206, which must be—

equal to the profit which is ordinarily added, * * * by manufacturers or producers in the country of manufacture or production who are engaged in the same general trade.

There being no other producer of rock phosphate in the French protectorate of Morocco than the Office Cherifien des Phosphates, then it would seem logically to follow that the allowance to be made for profit would be the profit ordinarily added by the Office Cherifien des Phosphates in selling its product. In 1927, according to collective Exhibit 10, the sales were 1,198,006 tons, of which 70,000 tons were sold outside of Europe, 14,608 tons in Morocco, and the remainder in Europe. We think it may therefore be properly stated that the sales to European countries should be taken as the measure of the "profit

which is ordinarily added." We have heretofore stated that the net price f. o. b. Casablanca to such European countries during this period was approximately $6 per ton. Assuming the cost of production to be as claimed by appellant, the profit which should be added is the difference between said cost of production and said sum of $6. When such profit is added, the cost of production is such as to justify the antidumping finding here complained of.

We concur with the court below that no cost of production has been shown, as defined by the statute.

As a result of these considerations we arrive at the conclusion that the court below did not err in finding that neither foreign-market value nor cost of production is shown by the record, and we agree with the conclusion of Judge Cline that the appeal to reappraisement might well have been dismissed by the trial judge.

The judgment is *affirmed*.

DISSENTING OPINION

GARRETT, Judge: In dissenting from the former decision of this court, *United States* v. *J. H. Cottman & Co.*, 18 C. C. P. A. (Customs) 132, 136, T. D. 44095, which resulted in remanding the suit for a new trial, such comment as I then made was directed principally to the express adjudication by the majority that the price at which the phosphate rock was shown to have been sold and offered for sale to farmers in Morocco for their own use did not constitute foreign value in the sense of the antidumping law.

Since the case was being remanded I could discern no sound reason for then adjudicating that single question, but I went no further than to state:

I am not now prepared to concur in the view which they [the majority] express upon that subject   *   *   *.

I felt that in view of the course it had been determined by the majority to take with the case, it was not necessary—possibly not proper—that I then say more.

Since the present judgment constitutes a final disposition of all the issues involved in the suit, so far as this court is concerned, I deem it now proper to say that, in my opinion, for the purposes of this case, either the sales and offers of sales to the farmers, or farmers' cooperatives, or the sales and offers of sales to the factory, could and should, under the particular phraseology used in the law, be held to constitute transactions "in the ordinary course of trade" in raw phosphate rock in Morocco. It is my opinion that in defining foreign value in section 205 of the antidumping act, Congress, by using the phrase "in the ordinary course of trade *for home consumption*" (italics mine), must have intended it to be understood that what is there meant by "the ordinary course of trade" is the ordinary and usual course of trade in

the particular merchandise involved in the country from which exported for a particular and specific purpose—"home consumption."

The statutes construed in the case of *Goodyear Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. Appls. 351, T. D. 39158, and in the other cases cited in the majority opinion, did not contain the phrase "for home consumption."

The majority opinion says:

* * * The phosphate rock received by farmers and farm cooperatives in Morocco could not be sold and must be used in Morocco by the individual receiving it. * * * The same may be said of the sales to the superphosphate works.

From this it is concluded that a restricted market results, defeating free sales or free offers to sell.

This apparently reads out of section 205 the words "for home consumption," or, at least, disregards this important element in the yardstick which Congress expressly adopted for measuring or determining foreign value in the administration of the antidumping act.

Even if it be granted that, in a sense, a restricted market results, the fact remains that Congress has made the element which brings about the restriction an essential one for taking the measure of the particular foreign value which is applicable in this particular law.

The very phraseolgy, naming the different elements entering into foreign value, itself restricts the sales made or offered that are to be considered in determining foreign value to those "for home consumption." It is not questioned that any one in Morocco who had any personal use for raw phosphate rock "for home consumption" could buy it freely in the usual wholesale quantities for that purpose, which is the only purpose the statute prescribes.

While that portion of the antidumping law defining "dumping" leaves much to be desired for clarity as to congressional meaning, section 205 defining foreign value *for the purposes of the particular act* seems to me to be quite clear.

I can not but feel that the majority is here applying a principle derived from the construction of other "foreign value" sections to a section whose wording embraces language not contained in the formerly construed sections, and that in so doing they, in effect, take out of the section an important and, presumably, a deliberately used phrase expressive of the legislative purpose and will.

I have used above the expression "for the purposes of this case." That is used for the obvious reason that, under a different state of facts, it might be necessary under my view of the case to determine and adjudicate the question of which sales (those to the farmers or those to the factory) constitute foreign value. Here it would not be necessary, even were mine the prevailing opinion, because if either were taken the result would sustain the importer's contentions.

There are other phases of the majority opinion with which I am in disagreement, such as the effect to be given the sales to Japan and certain other foreign countries; but realizing the fact that dissenting opinions are seldom of any real value, I am content to forego further discussion.

I think judgment should be for the importer.

LENROOT, Judge: I concur in the conclusion reached by the majority of the court and in all of the opinion except that portion relating to the cost of production of phosphate rock in Morocco. I agree that the record before us does not disclose proof of the statutory cost of production. Even assuming that there is sufficient evidence in the record from which an allowance for profit can be ascertained, in accordance with section 206 of the Antidumping Act of 1921, there is no evidence whatever in the record of the cost to the Government of Morocco, if any, of the phosphate rock nor of the amount of the general expenses incurred in producing it. I am therefore of the opinion that no cost of production, as required by the statute, is shown on the record.

However, as I construe the majority opinion, it holds that, even though the phosphate rock cost the Government of Morocco nothing, in such case the *value* of the rock must be included as an element of the cost of production; or, if not included, then there can be no cost of production found in accordance with section 206, *supra*.

The majority opinion states:

The Cherifien Government has taken possession of the rock phosphate mines of the country, declaring a governmental monopoly therein. Whether the lands and mines constituted a part of the public domain, or whether they were taken by the Goverment after payment to the owners thereof, does not appear. Certainly the product of these mines has a value, for it finds ready sale. The government, however, by its rights of sovereignty, and possessing the right of taxation with which it may maintain itself and acquire and hold these valuable deposits, claims that it should have the right to include these materials as costing nothing.

No individual could do business in this way. It is quite impossible to conceive of a situation where a private individual might obtain a monopolistic ownership and control of some natural product, without some expenditure of labor or money, which would constitute the cost, to him, of his product. When a government does this it does so because of sovereign power, its right to take private property, its maintenance of armies and executive establishments, its right to tax its people. No just comparison can be made between the cost of material to the individual, and to the government, in such cases. There was no cost of material shown by collective Exhibit 5, and this we hold must be done. If it be said that the cost of material is incapable of ascertainment under such conditions, then no cost of production can be shown, under this statute, because of the absence of this statutory element therein.

I can not agree that the foregoing is a correct statement of the law, and no authorities are cited to support it.

I am firmly of the opinion that if the phosphate rock in question before being mined costs the Government of Morocco nothing it does not form an element of the cost of production, and it is immaterial what its value was before being mined. Therefore, neither its value should be considered, nor should the fact that the phosphate rock costs the Government of Morocco nothing, if that were established, prevent a finding of its cost of production as provided by said section 206.

In my opinion, if the views of the majority above quoted be a correct statement of the law the flexible-tariff provisions embodied in section 336 of the Tariff Act of 1930, wherein the same phrase, "cost of materials," is used, may be invoked to injure some industries in the United States, which would be directly contrary to the disclosed purposes of said Tariff Act of 1930.

Many governments of the world own and control materials exported to the United States which, in their raw or unmanufactured state, cost such governments nothing. Oil is an example; other commodities might be named. Assume that the Government of Morocco is the only foreign producer of phosphate rock; that such phosphate rock before being mined costs the Government of Morocco nothing, but that other statutory elements of costs of production amounted to $3 per ton; that the cost of producing phosphate rock in the United States, including all of the statutory elements, is $4.50 per ton, and that a tariff rate of $1 per ton is imposed by the tariff law upon phosphate rock. Under such a state of facts the phosphate rock imported from Morocco may entirely destroy the domestic industry. Thereupon an American producer makes application to the Tariff Commission for an investigation of the difference in cost of production of the domestic and foreign article with a view to securing an increase of 50 per centum in the tariff rate to equalize the difference in cost of production, such increase of 50 per centum bringing the rate to $1.50 per ton, which would equalize the difference in actual cost of production so that the American producer could compete with the imported phosphate rock. We will assume that the Tariff Commission finds that the actual cost of production in Morocco, excluding any allowance for cost of material, is $3 per ton, and that the domestic cost is $4.50 per ton. If the commission shall follow the rule declared in the majority opinion, hereinbefore quoted, it must find that no cost of production in Morocco can be ascertained without some allowance being made for the value of the material before being mined by the Government of Morocco. If such allowance be $1.50 or more per ton, then the American producer can receive no relief under the flexible tariff provisions of the tariff act; or, if the allowance be less than $1.50 per ton, said American producer will still be handicapped in competing with the Moroccan Government in our market by whatever allowance

is made for the value of material. On the other hand, if the commission finds that no value of the material before mining can be ascertained, then, to follow the majority opinion herein, resort must be had to other provisions of said section 336, such as the weighted average of the invoice prices or values and/or the average wholesale selling price, which, if accepted by the commission as evidence of cost of production, would presumably result in a finding of a higher cost of production than would be found if the rule declared in the majority opinion had not been followed, which would operate to the injury of the American producer.

I have no doubt that Congress realized fully that the commission would at times find great difficulty in ascertaining the exact cost of production of an article or commodity, but I do not think that it could have intended that the phrase "cost of materials" should be so construed as to require that some amount be added therefor to the other statutory elements of cost of production when in fact the material cost the foreign producers nothing. It is clear to me that the rule laid down by the majority does add a new difficulty to those which inhere in the ascertainment of cost of production under said section 336 and that Congress never intended that resort should be had to the weighted average of invoice prices or values and/or the average wholesale selling price in any case where it is affirmatively shown that the material in question actually cost the foreign producers nothing and all of the other statutory elements of cost of production are readily ascertainable.

I have felt it necessary to dissent from the views of the majority with respect to the matters above stated for the reasons hereinbefore outlined. However, it is clear that appellant in this case has failed to make any showing with respect to the cost of the material to the foreign producer, if any, nor has he shown other statutory elements of cost of production, as hereinbefore discussed. Accordingly, on such a record the discussion in the majority opinion as to the absolute necessity for adding some amount as the cost of material, even though the material has actually cost the foreign producers nothing, is, in my opinion, *obiter*.