**NSK LTD. and NSK Corporation, Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee,**

and

**Federal–Mogul Corporation, Defendant,**

and

**The Torrington Company, Defendant–Appellee.**

No. 96–1359.

United States Court of Appeals, Federal Circuit.

June 10, 1997.

Robert A. Lipstein, Lipstein, Jaffe & Lawson, L.L.P., Washington, DC, argued for the plaintiffs-appellants. With him on the brief were Matthew P. Jaffe and Grace W. Lawson.

Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellee The United States. With her on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director. Of counsel on the brief were Stephen J. Powell, Chief Counsel, Berniece A. Browne, Senior Counsel, Mark A. Barnett, Attorney, Thomas H. Fine, Attorney, and Dean A. Pinkert, Attorney, Office of the Chief Counsel for Import Administration, Department of Commerce, Washington, DC.

James R. Cannon, Jr., Stewart & Stewart, Washington, DC, argued for defendant-appellee The Torrington Company. With him on the brief were Terence P. Stewart and Patrick J. McDonough. Of counsel was William A. Fennell.

Before PLAGER, RADER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

This is an antidumping case. Plaintiff–Appellant NSK Ltd., a Japanese corporation, is a manufacturer and exporter of antifriction bearings. Plaintiff–Appellant NSK Corporation, a United States corporation and a wholly-owned subsidiary of NSK Ltd., is an importer and manufacturer of antifriction bearings. Defendant–Appellee The Torrington Company ("Torrington") is a United States producer of antifriction bearings. [1]

NSK Ltd. and NSK Corporation (collectively "NSK") appeal portions of the final decisions of the United States Court of International Trade in *NSK Ltd. v. United States*, 896 F.Supp. 1263 (CIT 1995), and *NSK Ltd. v. United States*, No. 92–07–00470, 1996 WL

---

**1.** Federal-Mogul Corporation (Federal–Mogul), also a United States producer of antifriction bearings, and a defendant below, is not a party to this appeal.

109429 (CIT Mar. 7, 1996). In these decisions, the court decided the lawfulness of various aspects of the final results issued by the International Trade Administration, United States Department of Commerce ("Commerce"), in its review of the antidumping duty order in effect for antifriction bearings. Those final results are set forth in *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews,* 57 Fed. Reg. 28,360 (1992).[2]

Of relevance to this appeal, the court sustained the following decisions by Commerce: (i) samples that NSK gave free of charge to potential customers constituted "sales" under the antidumping laws; (ii) dumping margins for imported antifriction bearing parts that were used in the manufacture of complete antifriction bearings in the United States were computed by subtracting from the price of the complete antifriction bearings the value added by the United States manufacturer; (iii) home market credit expenses incurred by NSK Ltd. were not circumstances of sale expenses, for which an adjustment would be made to the foreign market value of NSK's merchandise; and (iv) early payment discounts and distributor incentive rebates extended by NSK Ltd. in the home market were not to be included in calculating NSK Ltd.'s cost of production for purposes of performing a cost test to determine whether merchandise was being sold by NSK Ltd. in the home market at prices below the cost of production. We affirm-in-part, reverse-in-part, and remand.

## BACKGROUND

### I.

The antidumping laws impose additional duties on imported products that are being sold, or are likely to be sold, at less than their fair value to the detriment of a domestic industry. 19 U.S.C. § 1673 (1988).[3] The quantum of the additional duties is known as the "dumping margin," and is equal to the amount by which the foreign market value exceeds the United States price for the merchandise. 19 U.S.C. § 1673; 19 C.F.R. § 353.2(f)(1) (1996).[4] Thus, the additional duties are designed to correct the dumping margin. *See Zenith Electronics Corp. v. United States,* 988 F.2d 1573, 1576 (Fed.Cir. 1993).

■■■ Foreign market value is computed based on one of three methods: (i) home market sales; (ii) third country sales; and (iii) constructed value. *See* 19 U.S.C. § 1677b(a)(1)-(2) (1988); *Smith–Corona Group v. United States,* 713 F.2d 1568, 1572–73 (Fed.Cir.1983). Computation of foreign market value based on home market sales is preferred. *See Smith–Corona,* 713 F.2d at 1573. United States price is measured by either the purchase price or the exporter's sales price, depending on the nature of the relationship, if any, between the importer and the exporter. *Koyo Seiko Co., Ltd. v. United States,* 36 F.3d 1565, 1567 (Fed.Cir. 1994); *see* 19 U.S.C. § 1677a(a) (1988). The United States price will be the purchase price if the domestic importer is unrelated to, and independent of, the foreign producer. *Koyo Seiko,* 36 F.3d at 1567. On the other hand, the United States price will be the exporter's sales price if the importer and exporter are related, such as in this case, where the importer (NSK Corporation) is a subsidiary of the exporter (NSK Ltd.). *See id.* Purchase price is defined as "the price at which merchandise is purchased, or agreed

---

**2.** As amended for clerical errors, *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Sweden, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews,* 57 Fed.Reg. 59,080 (1992).

**3.** The antidumping laws were amended by the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 ("URAA"). The amendments, however, do not apply to administrative reviews initiated before January 1, 1995. *See*

*Zenith Electronics Corp. v. United States,* 77 F.3d 426, 428 n. 1 (Fed.Cir.1996). Because this case involves administrative reviews initiated before January 1, 1995, we use the antidumping laws in effect prior to the URAA. For simplicity, we will speak in the present tense when referring to the pertinent statutes.

**4.** We cite to the most recent version of the regulations, unless a substantive change has been made since 1992, the year in which the events giving rise to the present dispute arose.

to be purchased, ... from a reseller or the manufacturer or producer of the merchandise for exportation to the United States." 19 U.S.C. § 1677a(b) (1988). Exporter's sales price is defined as the "price at which merchandise is sold or agreed to be sold in the United States ... by or for the account of the exporter...." *Id.* § 1677a(c) (1988).

 To ensure that dumping duties are calculated in a fair manner, foreign market value and United States price are subject to various adjustments to achieve a common basis for comparing prices. *Koyo Seiko,* 36 F.3d at 1568. Examples of such adjustments are found in 19 U.S.C. §§ 1677a(d)-(e) and 1677b(a)(1), (a)(4) (1988). Such adjustments may result from costs, charges, and expenses incurred as a result of exporting the goods from the home country to the United States. *See id.* For example, section 1677a(e)(3) provides that exporter's sales price is to be reduced by "any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise." At the same time, section 1677b(a)(4)(B) provides that foreign market value is to be adjusted for differences in "circumstances of sale." Such circumstances of sale include costs for " 'advertising, warranty and after sales services, packing costs, and after sales rebates.' " *Koyo Seiko,* 36 F.3d at 1568 (quoting *Smith–Corona Group,* 713 F.2d at 1573 n. 12).

 Finally, in its calculation of foreign market value, Commerce disregards sales of merchandise at below-cost, if certain conditions are met.[5] 19 U.S.C. § 1677b(b) (1988). In order to determine whether merchandise is being sold at below-cost, section 1677b(b) provides that upon reasonable grounds for belief or suspicion, Commerce performs a cost test in which it determines whether merchandise has been sold "in the home market of the country of exportation" at prices lower than the "cost of producing the merchandise in question." To ensure that a fair compari-

son is made, Commerce includes selling and other expenses in both the home market price and the cost of production ("COP"). *See, e.g., Federal–Mogul Corp. v. United States,* 862 F.Supp. 384, 401 (CIT 1994) (remanding case to Commerce to take into account certain expenses to ensure that fair comparison of home market price and COP was made); *Nachi–Fujikoshi Corp. v. United States,* 798 F.Supp. 716, 721 (CIT 1992) (noting that to ensure fair comparison of home market price and COP, Commerce has often made allowances for rebates). Whenever Commerce disregards sales on the ground that they were made at less than the cost of production, and the remaining sales, which were not made at less than the cost of production, are deemed to be inadequate as a basis for the determination of foreign market value, Commerce uses the constructed value of the merchandise to determine foreign market value. *Id.*

This appeal involves two questions of law: (i) whether free samples of NSK merchandise imported into the United States should be included in the calculation of exporter's sales price for purposes of determining United States price; and (ii) whether Commerce's calculation of dumping margins for imported antifriction bearing parts was inconsistent with 19 U.S.C. § 1677a(e)(3) noted above. The appeal also involves two fact issues. The first is whether, in determining foreign market value for NSK merchandise, Commerce should have made allowance for certain home market credit expenses under 19 U.S.C. § 1677b(a)(4)(B), on the ground that the difference between the foreign market value of NSK's merchandise and its United States price was the result of the home market credit expenses creating a difference in the circumstances of sale. The second is whether, when Commerce conducted a cost test under 19 U.S.C. § 1677b(b) for NSK's merchandise, it should have included in COP as selling, general, and administrative ("SG & A") expenses certain discounts and rebates extended by NSK Ltd. in the home market.

---

**5.** Those conditions are: (i) that the sales "have been made over an extended period of time and in substantial quantities," and (ii) that the sales "are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade." 19 U.S.C. § 1677b(b).

## II.

Unless otherwise noted, the facts are not in dispute. On May 3, 1989, Commerce issued final determinations in its less-than-fair-value ("LTFV") investigation relating to sales of antifriction bearings (other than tapered roller bearings) and bearing parts in various countries, including Japan. On May 15, 1989, as a result of the investigation, Commerce published antidumping duty orders with respect to various types of antifriction bearings and parts thereof from different countries, including Japan.[6] Thereafter, Commerce engaged in a first administrative review covering the period November 9, 1988, to April 30, 1990, for which it issued final results on July 11, 1991.[7]

The second administrative review period—the period which is directly relevant to this appeal—was May 1, 1990, to April 30, 1991; Commerce initiated reviews for this period between June 28 and August 14, 1991.[8] Commerce issued preliminary results for Japan in the second administrative review on March 31, 1992,[9] and final results on June 24, 1992.[10] During the second period of review, NSK gave away sample bearings to potential customers in the United States at no charge. Over NSK's objection, Commerce included these samples in the United States sales

database and used them in calculating exporter's sales price—assigning them a zero price. In the final results for the second administrative review, Commerce explained that it included the samples because "goods entered for consumption are subject to an antidumping order wherever ownership transfers from the exporter of the goods to an unrelated U.S. purchaser." 57 Fed.Reg. at 28,395. Commerce found that NSK failed to show that it retained ownership of the samples after exportation to the United States. *Id.*

During the second administrative review period, NSK imported parts that were used in the manufacture of finished bearings in the United States before the finished bearings were sold to unrelated customers. Commerce had to determine the dumping margins, if any, for these imported parts. In the LTFV investigation and first administrative review, Commerce applied the dumping margins of the finished bearings to the parts because it felt that such margins would be a reasonable estimate of the antidumping duties for the parts. However, for the second administrative review period, Commerce requested that NSK provide certain information on the parts. In particular, Commerce requested that NSK provide pertinent information which would enable Commerce to

**6.** *Final Determinations of Sales at Less Than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan,* 54 Fed.Reg. 19,101 (1989). Generally, Commerce makes preliminary and final determinations as to whether merchandise is being sold, or likely to be sold, at less than its fair value in the United States. *See* 19 U.S.C. §§ 1673b(b)(1), 1673d(a)(1) (1988); *Texas Crushed Stone Co. v. United States,* 35 F.3d 1535, 1537 (Fed.Cir.1994). If Commerce's findings in the final determination are in the affirmative, then the International Trade Commission ("ITC") makes a final determination of material injury to the United States. 19 U.S.C. § 1673d(b)(1) (1988). If the ITC determines that such injury exists, then Commerce issues an antidumping duty order. 19 U.S.C. § 1673d(c)(2) (1988).

**7.** *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany; Final Results of the Antidumping Duty Administrative Review,* 56 Fed. Reg. 31,692 (1991). Generally, an administrative review involves reassessing dumping margins; the results of an administrative review serve as the basis for the actual assessment of

duties for entries of merchandise during the period covered by the review. *See Silver Reed Am., Inc. v. United States,* 9 CIT 221, 224 (1985).

**8.** *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Initiation of Antidumping Administrative Reviews,* 56 Fed.Reg. 29,618 (1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed.Reg. 33,251 (1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed.Reg. 40,305 (1991).

**9.** *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews,* 57 Fed.Reg. 10,868 (1992).

**10.** *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews,* 57 Fed.Reg. 28,360 (1992).

conduct a further processing analysis of the parts. Such information included data on further processing and manufacturing in the United States. Using this information, Commerce calculated the exporter's sales price for the imported parts by deducting from the sales price of the finished bearings the costs of further processing done on the imported parts in the United States. The remaining sum represented the price of the imported parts. Commerce then calculated the dumping margins for the parts by subtracting the United States price (which was the exporter's sales price) from the foreign market value of the parts.

In its final results, Commerce explained that its decision in the first administrative review to not examine further-processed imported parts was based on the circumstances of that review. However, for the second administrative review, Commerce determined that information on these parts was necessary to determine whether they constituted a significant portion of the value of finished bearings. *See* 57 Fed.Reg. at 28,396–97.

In addition, in the final results of the second administrative review, Commerce did not adjust downward the foreign market value of NSK's merchandise for certain home market credit expenses which were incurred by NSK Ltd. and which NSK had argued should be considered circumstances of sale under section 1677b(a)(4). Commerce based its decision on the failure of NSK to submit the credit expenses on either a customer-specific or transaction-specific basis. 57 Fed.Reg. at 28,405. Commerce explained that while it had accepted an alternative method of reporting in the first administrative review— reporting the credit expenses on the basis of the best information otherwise available—it had warned respondents at that time that it would not accept such alternative methods of reporting thereafter. *See id.;* 56 Fed.Reg. at 31,724.

Finally, during a cost test investigation pursuant to 19 U.S.C. § 1677b(b) to determine whether NSK Ltd. was selling bearings in the home market at prices below COP, Commerce did not include early payment discounts and distributor incentive rebates as expenses for purposes of calculating NSK Ltd.'s COP. *See* 57 Fed.Reg. at 28,418. Thus, Commerce did not deduct these amounts from its calculation of NSK Ltd.'s home market prices.[11]

### III.

Pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) (1988), NSK commenced an action in the Court of International Trade, challenging various aspects of the final results for the second administrative review. NSK alleged, *inter alia,* that Commerce erred in: (i) its utilization of samples as zero price "sales" in calculating exporter's sales price; (ii) its analysis of imported parts that were used in the manufacture of products within the same class or kind of merchandise that was subject to the antidumping orders; (iii) its failure to adjust foreign market value for NSK Ltd.'s home market credit expenses; and (iv) its failure to include early payment discounts and distributor incentive rebates as expenses in calculating NSK's COP for purposes of performing the section 1677b(b) cost test. In due course, Torrington and Federal–Mogul were allowed to intervene in the case as defendants.

The Court of International Trade issued a decision on August 1, 1995. In its decision, the court addressed Commerce's treatment of NSK's samples as zero-priced sales. The court found that Commerce had failed to adequately explain the standard it used to evaluate these samples, and therefore it remanded the issue to Commerce. *NSK Ltd. v. United States,* 896 F.Supp. 1263, 1268 (CIT 1995). Second, the court upheld Commerce's method of calculating the dumping margins for imported antifriction bearing parts used in the manufacture of antifriction bearings. *Id.* at 1271.

Additionally, the court sustained Commerce's rejection of NSK Ltd.'s home market credit expenses as circumstances of sale ex-

---

**11.** To ensure that an even comparison is made in a cost test, Commerce includes the same expenses in home market price and COP. Therefore, Commerce deducts discounts and rebates from the sales prices of the home market unless they have been reported as expenses, including SG & A expenses, as part of COP.

penses for which a downward adjustment would be made to foreign market value. The court found that Commerce could alter its required reporting methodology when striving for more accuracy. *Id.* at 1275. Further, the court noted, Commerce adequately warned NSK in its final results for the first administrative review that its prior reporting methodology would be unacceptable in a second administrative review. *Id.* Finally, the court determined that Commerce was justified in not including NSK Ltd.'s early payment discounts and distributor incentive rebates in calculating COP for purposes of performing the section 1677b(b) cost test. *Id.* at 1277. The court noted that the burden was on NSK to establish entitlement to the adjustment. In that regard, the court determined that NSK had submitted to Commerce contradictory evidence—in the form of conflicting exhibits—and that NSK thus had failed to show that Commerce's decision was not supported by substantial evidence. *Id.* at 1276–77.

On remand, Commerce explained that it included zero-priced samples in its dumping analysis because of its "longstanding policy ... to consider a transaction as a 'sale' for the purposes of the dumping analysis if the ownership of the merchandise in question is transferred from the respondent to [an] unrelated U.S. purchaser." Commerce noted that if the term "sale" required consideration, then a loophole would form that would allow the lowest priced U.S. transactions to escape review. Commerce also stated that even if consideration is a required element of a sale, it was present in this case. Commerce reasoned that the samples, if suitable, would make NSK a potential supplier, and if not suitable, NSK could alter its bearings accordingly. NSK appealed Commerce's remand determination to the Court of International Trade, but the court sustained the findings and conclusions. *NSK Ltd. v. United States,* No. 92–07–00470, 1996 WL 109429 (CIT Mar. 7, 1996). This appeal by NSK followed.

## DISCUSSION

### I.

NSK raises *four* contentions on appeal with respect to the second administrative review: (1) Commerce erred in including in its exporter's sales price calculation samples that NSK gave free of charge to potential customers in the United States; (2) Commerce erred in calculating the antidumping margins for imported antifriction bearing parts; (3) Commerce erred in not treating NSK Ltd.'s home market credit expenses as circumstances of sale expenses, thereby disallowing a downward adjustment to foreign market value for these expenses; and (4) Commerce erred in not including NSK Ltd.'s early payment discounts and distributor incentive rebates in NSK's COP when performing the section 1677b(b) cost test.

■■■ We review a decision of the Court of International Trade affirming or reversing the final results of an administrative review *de novo. Torrington Co. v. United States,* 82 F.3d 1039, 1044 (Fed.Cir.1996); *see Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1559 (Fed.Cir.1984). In so doing, we "apply anew" the Court of International Trade's statutorily-mandated standard of review of the administrative review. *Torrington Co.,* 82 F.3d at 1044. Thus, pursuant to 19 U.S.C. § 1516a(b)(1)(B) (1994), we will uphold final results unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Electric Industrial Co. v. United States,* 750 F.2d 927, 933 (Fed. Cir.1984) (citations omitted).

■■■ In determining the lawfulness of an agency's construction of a statute, we are guided by the Supreme Court's decision in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* the first question is "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781.

If, however, the statute is "silent or ambiguous with respect the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782 (footnote omitted). We have stated that "[t]o survive judicial scrutiny, an agency's construction need not be the *only* reasonable or even the *most* reasonable interpretation. Rather, a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." *Koyo Seiko,* 36 F.3d at 1570 (citing *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978)). Moreover, "[d]eference to any agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws." *Id.* (citing *Daewoo Electronics Co., Ltd. v. International Union of Electronic, Electrical, Technical, Salaried and Machine Workers, AFL–CIO,* 6 F.3d 1511, 1516 (Fed.Cir.1993)).

We note at the outset that Commerce's decision rejecting NSK Ltd.'s home market credit expenses as circumstances of sale expenses and its decision that NSK Ltd.'s early payment discounts and distributor incentive rebates were not to be included as part of COP were both factual determinations. This is because they concerned, respectively, (i) whether NSK reported the credit expenses on a proper basis under Commerce's standards; and (ii) whether NSK could show that the early payment discounts and distributor incentive rebates were part of its COP. Having reviewed the record, we have concluded that Commerce's decisions on these issues are supported by substantial evidence. Accordingly, in the balance of this opinion, we consider the first two issues raised on appeal.

## II.

As seen above, in determining the United States price for NSK's antifriction bearings, Commerce included in the United States sales database, and therefore used in computing exporter's sales price, sample bearings which NSK gave to potential customers in the United States at no charge. NSK argues that this was error.

The antidumping law provides that antidumping duties are assessed when "foreign merchandise is being, or is likely to be, *sold* in the United States at less than its fair value" to the detriment of a domestic industry. 19 U.S.C. § 1673 (1988) (emphasis added). As explained above, the antidumping duty equals the amount by which foreign market value exceeds the United States price for the merchandise, *see* 19 U.S.C. § 1673, and in this case, exporter's sales price is the proper measure of United States price. *See Koyo Seiko,* 36 F.3d at 1570. Exporter's sales price is defined in pertinent part in 19 U.S.C. § 1677a(c) as the "price at which merchandise is *sold* or agreed to be *sold* in the United States." (emphasis added). Commerce's regulations state that "[i]n calculating the United States price, the Secretary will use sales or, in the absence of sales, likely sales, as defined in § 353.2(t)." 19 C.F.R. § 353.41(a) (1996). Section 353.2(t) states that "[a] 'sale' includes a contract to sell and a lease that is equivalent to a sale. A 'likely sale' means a person's irrevocable offer to sell." 19 C.F.R. § 353.2(t) (1996).

The government argues that samples NSK imported into the United States and gave to potential customers at no charge constituted sales. If the government is correct, these samples should be given a "zero price" for purposes of calculating exporter's sales price under 19 U.S.C. § 1677a(a), thereby driving down the average United States price. A lower United States price, of course, means a larger difference between foreign market value and United States price, thereby increasing the dumping margin under section 1673. Thus, greater dumping duties will be assessed on the merchandise.

The government contends that neither the statutes nor the relevant regulations define the term "sale." It asserts that 19 C.F.R. § 353.2(t) provides only a partial definition of sale because it states in pertinent part that "[a] 'sale' *includes* a contract to sell." (emphasis added). Because Congress has not spoken on the precise issue, the government argues, the court should defer to its interpretation under the second prong of the *Chevron*

analysis. The government notes that it is long-standing policy to consider a transaction a "sale" for purposes of the dumping margin analysis if ownership of merchandise is transferred from an exporter to an unrelated United States purchaser. The government argues that this approach is permissible because it "prevents a loophole in the antidumping law that would allow the lowest priced U.S. transactions to escape review and would accordingly threaten the effective enforcement of the law." [12]

In addition, the government argues that even if consideration is a necessary component of a "sale," then consideration exists for the samples at issue in this case:

> The samples were provided to the customer to determine the suitability of the bearing to the customers' needs. While the Department recognizes that the customers were under no obligation to subsequently purchase these bearings from NSK, a determination that the bearings were suitable would allow NSK to be a potential supplier whereas a determination of non-suitability would provide NSK with information necessary to allow it to alter the bearings in order to become a potential supplier at some future time. In light of the purposes of the antidumping laws, such consideration would be adequate to a determination that the transfers of the zero-priced samples constituted sales.

We disagree. The government is correct that there is no explicitly stated definition of the term "sale" or "sold" in the relevant statutory provisions or legislative history. However, we believe that Congress intended to give the term its ordinary meaning, thereby making any explicit definition unnecessary. As stated by the Supreme Court, "[w]here Congress uses terms that have accumulated settled meaning under either equi-

ty or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981).

■ Black's legal dictionary defines sale as "[a] contract between two parties, called, respectively, the 'seller' (or vendor) and the 'buyer' (or purchaser), by which the former, in consideration of the payment or promise of payment of a certain price in money, transfers to the latter the title and the possession of property." *Black's Law Dictionary* (6th ed. 1990). In addition, Webster's Dictionary defines a sale as "the act of selling: a contract transferring the absolute or general ownership of property from one person ... to another for a price (as a sum of money or any other consideration)...." *Webster's Third New International Dictionary* 2003 (1986). Plainly, under the commonly-accepted meaning of the term, consideration is a necessary element of a sale.

■ In addition, contrary to the government's suggestion, we do not believe that the term "sale" should be given any special meaning under the antidumping laws. The Court of Customs and Patent Appeals, a predecessor of this court, has held that "sale" should be given its ordinary meaning under the antidumping laws. In *J.H. Cottman & Co. v. United States*, 20 C.C.P.A. 344, 1932 WL 2134 (1932), the court was faced with determining whether certain transactions constituted proof of foreign market value under section 205 of the Antidumping Act of 1921, an issue dependent on whether the goods in question were considered "sold or freely offered for sale." [13] *Id.* at 353. In its analysis of this clause, the court stated:

---

12. To illustrate its contention, the government poses a hypothetical situation, in which the foreign market value of an item is ten dollars, and ten units are imported into the United States, with eight of the units being sold for ten dollars each and the remaining two units being designated "free samples." The government asserts that if the samples are disregarded, then the dumping margin will be zero. However, if the samples are included in United States price, then the average United States price will be eight dollars, resulting in a dumping margin of two dollars per

unit, or twenty-five percent. The hypothetical, of course, is premised on the proposition that giving a sample away free of charge is no different from a sale. If giving a sample is different from a sale, however, there is no loophole.

13. Section 205 provided in pertinent part that: "the foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is *sold or freely offered for sale* to all purchasers in the

The statute with which we are dealing recites that, to constitute foreign-market value, the goods must be "sold or freely offered for sale." This expression should be given its ordinary meaning. The word "sale" is thus defined by Webster's New International Dictionary, 1932:

> Act of selling; a contract whereby the absolute, or general, ownership of property is transferred from one person to another for a price, or sum of money, or loosely, for any consideration.

Such, also, is the usual meaning given to it by courts, unless by accompanying language, some other meaning is evidently intended.

*Id.* at 356 (citations omitted).

In *Wood v. United States,* 62 C.C.P.A. 25, 505 F.2d 1400 (Cust. & Pat.App. 1974), the issue before the court was whether transactions between a Canadian exporter and its wholly-owned subsidiary, an American importer, constituted sales which should be considered in determining export value under section 402(b) of the Tariff Act of 1930.[14] *See id.* at 1401–02. In analyzing the issue, the court stated:

> The requirements of a 'sale' for purposes of sections 402(b) and 402(f)[15] were not defined by the appellate term[16], but ... the legislative history clearly shows that Congress intended use of sales to exclusive agents in determining export value; and there is nothing to indicate that the word 'sales' was intended to have other than its ordinary meaning, namely: transfers of property from one party to another for a consideration.

*Id.* at 1406 (citing, *inter alia, J.H. Cottman,* 20 C.C.P.A. at 356).

We conclude that the term "sold," as used in 19 U.S.C. §§ 1673 and 1677a(c), requires both a transfer of ownership to an unrelated party and consideration. The terms of the statutory provisions are clear on their faces and we see no reason to depart from the ordinary meaning of the term "sold" or "sale." We thus need not reach the second prong of the *Chevron* analysis.

NSK's samples given to potential customers at no charge lacked consideration. Consideration generally requires a bargained-for exchange. 3 Williston on Contracts, § 7:2 at 18–19 (4th ed. 1992); 2 Corbin on Contracts, § 5.1 at 6 (Rev. ed. 1995); Restatement (Second) of Contracts, § 71 (1979). When the promisor may choose to perform based solely on whim, then the promise will not serve as consideration. 3 Williston on Contracts, § 7:7 at 89; *see* 2 Corbin on Contracts, § 5.28 at 142–43; Restatement (Second) of Contracts, § 2 cmt. e (1979); *Maccaferri Gabions, Inc. v. Dynateria, Inc.,* 91 F.3d 1431, 1443 (11th Cir.1996). In this case, there is no evidence that potential customers had any obligation regarding samples received from NSK. These potential customers were free to transact with NSK based solely on their whim. In addition, we reject the government's argument that customer response to the free samples amounted to consideration because it provided NSK with information that presumably would be useful to it in altering the bearings to suit customer demand. Because NSK's samples did not constitute "sales," they should not have been included in calculating United States price. Therefore, that part of the Court of International Trade's decision which affirmed Commerce's interpretation of "sales" is reversed.

---

principal markets of the country from which exported ...." (emphasis added).

**14.** Section 402(b) provided in pertinent part:
(b) Export value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States....

**15.** Section 402(f) was a definitional section.

**16.** Referring to the appellate term of the United States Customs Court, from which appeals were taken to the United States Court of Customs and Patent Appeals.

### III.

We turn next to the issue of imported parts that are used in the manufacture of completed merchandise in the United States. Section 1677a(e) provides in pertinent part as follows:

For purposes of this section, the exporter's sales price shall ... be adjusted by being reduced by the amount, if any, of -

. . . .

(3) any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise.

19 U.S.C. § 1677a(e)(3) (1988).

The statute provides that adding value to imported merchandise causes the exporter's sales price to be reduced by the amount of the added value, thereby increasing the difference between foreign market value and United States price. This increase results in a larger dumping margin under section 1673 for the merchandise that has value added to it, with the result that greater dumping duties are assessed for that merchandise. As noted above, in the LTFV investigation and first administrative review, Commerce used, as the dumping margins for imported antifriction bearing parts, the margin for the finished antifriction bearings. For the second administrative review period, however, Commerce sought to determine in more precise fashion the dumping margins for the parts. It sought to accomplish this by construing the United States price. As part of this effort, it requested that NSK provide information related to further processing of its imported parts that were used in the manufacture of finished bearings in the United States. This information was used by Commerce to calculate exporter's sales price for the imported parts by deducting from the sales price of the complete antifriction bearings the costs of further processing in the United States. In the final results for the second administrative review, Commerce explained that such information was necessary to determine whether the parts constituted a significant portion of the value of the finished bearings. *See* 57 Fed.Reg. at 28,396–97.

NSK argues that Commerce's calculation of the dumping margins for imported antifriction bearing parts was inconsistent with 19 U.S.C. § 1677a(e)(3). According to NSK, section 1677a(e)(3) does not encompass the situation presented here: imported parts being used in the manufacture of completed merchandise in the United States which is then sold to an unrelated party, where the completed merchandise is of the same class or kind of merchandise as the imported parts (*i.e.,* scope merchandise). NSK argues that the legislative history indicates that the section applies when imported merchandise is consumed in producing another product in the United States, but only when that product *differs* from the class or kind of merchandise covered by the antidumping duty order (*i.e.,* non-scope merchandise). Thus, NSK contends Commerce should not have backed out of the price of antifriction bearings manufactured in the United States costs of production and processing in order to arrive at a separate United States price for the imported parts. NSK urges that the imported parts should have been assigned the same dumping margins as those of the finished bearings.

In support of its contention, NSK cites a passage from a report of the Committee on Ways and Means of the House of Representatives:

This amendment [now contained in section 1677a(e)(3) ] provides that whenever merchandise subject to an antidumping investigation or finding is imported by a person or corporation related to the exporter, i.e., an exporter's sales price situation, and the merchandise is changed by further process or manufacture so as to remove it from the class or kind of merchandise involved in the proceeding before it is sold to an unrelated purchaser, such merchandise will not escape the purview of the law, but appropriate adjustments for the value added will be made to arrive at an exporter's sales price.

H.R.Rep. No. 93–571, at 70 (1973).

NSK argues that because the legislative history specifically speaks of the situation where

imported merchandise is consumed in the manufacture of non-scope merchandise, Congress intended that the section not apply when the imported merchandise is consumed in manufacturing scope merchandise.

The government, on the other hand, contends that clear statutory language indicates that section 1677a(e)(3) applies to all imported products covered by the proceeding which are further processed in the United States prior to their sale to an unrelated purchaser. The government argues that there is no language in the statute limiting the statute's application to the situation in which imported scope merchandise is processed into non-scope merchandise. The government further asserts that the legislative history cited by NSK merely explains that scope merchandise further processed into non-scope merchandise will not escape the purview of the antidumping laws.

■ We agree with the government. First, the language of section 1677a(e)(3) makes no distinction between merchandise that is further processed into non-scope merchandise and scope merchandise. Rather, by its terms, the statute applies to all merchandise covered by the antidumping duty order—from parts to complete products—that is further processed in some way in the United States before being sold to an unrelated party.[17]

Furthermore, the legislative history of section 1677a(e)(3), in particular the House Report cited by NSK, merely indicates that one cannot escape the purview of the antidumping laws by importing items that are further processed in the United States into non-scope merchandise. See H.R. Rep. 93–571, at 70 (1973). This report by no means limits

the scope of the clear statutory language solely to this type of situation. Moreover, the Senate Report further supports the proposition that no such distinction was intended:

> The first amendment would codify existing ... regulations in providing that imported merchandise for which an exporter's sales price calculation must be made will not escape the purview of the [antidumping laws] by virtue of its being further processed or manufactured subsequent to its importation but before its sale to the first purchaser in the United States unrelated to the foreign exporter. Under the amendment, adjustments to the price at which the article is ultimately sold to an unrelated purchaser would be made in order to subtract out the value added to the merchandise after importation.

S.Rep. No. 93–1298, at 172–73 (1974), reprinted in 1974 U.S.C.C.A.N. 7186, 7310. The report clearly makes no distinction between parts used in scope merchandise versus non-scope merchandise.[18]

Finally, NSK argues that Commerce in the original LTFV investigation and first administrative review recognized that section 1677a(e)(3) does not apply to imported bearing components consumed in the production in the United States of complete bearings. As noted by NSK, in the preliminary results of the first administrative review, Commerce stated that:

> We have excluded from our price comparisons parts of bearings that were imported and further processed into finished bearings by U.S. affiliates of foreign exporters (prior to sale to unrelated U.S. customers). Both the bearing parts and the finished bearings are of the class or kind of merchandise subject to this review. We chose the alternative of applying any

---

17. An exception is the "Roller Chain" rule. Under this rule, Commerce excludes from its dumping analysis imported merchandise used in finished products which are sold to an unrelated person, where the imported merchandise constitutes an insignificant percentage of the finished products. See H.R.Rep. No. 93–571, at 70 (1973); Koyo Seiko Co., Ltd. v. United States, 92 F.3d 1162, 1165–66 (Fed.Cir.1996). The Roller Chain rule is not implicated in this appeal.

18. Decisions by the Court of International Trade support a broad interpretation of the statute. See Koyo Seiko Co., Ltd. v. United States, 861

F.Supp. 108, 114 (CIT 1994) (finding that components placed in a box with another component to be sold as a tapered roller bearing set qualified "as additional material or labor and a 'process of assembly' "); Daewoo Electronics Co., Ltd. v. United States, 760 F.Supp. 200, 210 (CIT 1991) (finding that replacing name brands on imported television receivers with private name plates was a value-added expense under section 1677a(e)(3)), aff'd-in-part and rev'd-in-part on other grounds, sub nom. Daewoo Electronics Co., Ltd. v. International Union of Electronic, Electrical, Technical, Salaried and Mach. Workers, AFL–CIO, 6 F.3d 1511 (Fed.Cir.1993).

dumping margins found on imports of completed bearings to imported parts of the same class or kind.

56 Fed.Reg. at 11,187.

The argument is without merit. Commerce's actions in the LTFV investigation and first administrative review concerning the imported bearing parts in question were not its normal procedure; at that time, Congress was seeking to simplify the antifriction bearing proceedings. *See* 54 Fed.Reg. at 19,028. In addition, as can be seen from its statement in the preliminary results of the first administrative review, Commerce plainly recognized that the bearing parts were subject to the antidumping duty order. Thus, Commerce's action in the first administrative review cannot be taken as indicating that Commerce interpreted section 1677a(e)(3) as NSK contends.

## CONCLUSION

The Court of International Trade erred in sustaining Commerce's interpretation of the term "sale" under the relevant antidumping provisions. However, it correctly sustained Commerce's other determinations in the second administrative review. Accordingly, the decision of the Court of International Trade is affirmed-in-part and reversed-in-part and the case is remanded to it for further proceedings consistent with this opinion.

## COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART, REVERSED–IN–PART, AND REMANDED.*