368 F.3d 1369
 NTN BEARING CORPORATION OF AMERICA, American NTN Bearing Manufacturing Corporation, and NTN Corporation, Plaintiffs-Appellants, and
NSK Ltd. and NSK Corporation, Plaintiffs-Appellants, and
Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A., Plaintiffs,
v.
UNITED STATES, Defendant-Appellee,
v.
The Timken Company, Defendant-Cross Appellant.
 No. 03-1041.
 No. 03-1048.
 No. 03-1072.
 United States Court of Appeals, Federal Circuit.
 May 21, 2004.
 
 Diane A. MacDonald, Barnes, Richardson, & Colburn, of Chicago, IL, argued for plaintiffs-appellants NTN Bearing Corporation of America, et al. On the brief was Donald J. Unger. Of counsel were Beata Kolosa Spuhler and Kazumune V. Kano.
 Matthew P. Jaffe, Lipstein, Jaffe & Lawson L.L.P., of Washington, DC, argued for plaintiffs-appellants NSK Ltd., et al. With him on the brief were Robert A. Lipstein, and Grace W. Lawson.
 David S. Silverbrand, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee the United States. With him on the brief was David M. Cohen, Director. Of counsel on the brief was Arthur D. Sidney, Attorney-Advisor, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC. Of counsel was Richard P. Schroeder, Attorney.
 William A. Fennell, Stewart and Stewart, of Washington, DC, argued for defendant-cross appellant The Timken Company. With him on the brief were Terence P. Stewart and Sarah V. Stewart. Of counsel were Patrick John McDonough and John Daniel Stirk.
 Before LINN, Circuit Judge, ARCHER, Senior Circuit Judge, and DYK, Circuit Judge.
 LINN, Circuit Judge.
 
 
 1
 NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, and NTN Corporation (collectively "NTN"), and NSK, Limited and NSK Corporation (collectively "NSK") appeal from a judgment of the United States Court of International Trade, in which the court reviewed the final determination of the Department of Commerce ("Commerce") relating to antidumping duties on the import of tapered roller bearings from Japan and China. NTN Bearing Corp. of Am. v. United States, 186 F.Supp.2d 1257 (Ct. Int'l Trade 2002) ("NTN Bearing I"). The Timken Company ("Timken") cross-appeals from the judgment. Because Commerce's final determination is supported by substantial evidence and is not erroneous as a matter of law, we affirm.
 
 BACKGROUND
 
 2
 Commerce initiated an antidumping duty administrative review of several manufacturers and exporters of tapered roller bearings from Japan in 1996. See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 61 Fed.Reg. 58,513 (Dep't Commerce Nov. 15, 1996). Commerce issued questionnaires to the affected parties, including both NTN and NSK, and based its preliminary determination in part on their responses. Commerce's preliminary determination was published on September 9, 1997. See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan, 62 Fed.Reg. 47,452 (Dep't Commerce Sept. 9, 1997) (preliminary admin. review).
 
 
 3
 Commerce gave the interested parties an opportunity to comment on the preliminary results and then issued final results that took those comments into account. See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan, 63 Fed.Reg. 2558 (Dep't Commerce January 15, 1998) (final admin. review) ("Final Results"). In these results, among other actions, Commerce: (1) employed affiliated-party cost data in (a) determining whether "foreign like products" were merchandise similar to U.S. tapered roller bearing models, (b) calculating the difference in merchandise ("difmer") adjustment for non-identical U.S. and home-market matches, and (c) recalculating NSK's reported U.S. inventory carrying costs, id. at 2573-75; (2) relied on facts available to adjust NTN's reported home market billing adjustments, id. at 2563; (3) relied on its own sampling of affiliated-party inputs to adjust NTN's reported cost of production ("COP") and constructed value ("CV") for those inputs, id. at 2572-73; (4) rejected Timken's argument that NTN's warehousing expenses were incorrectly allocated, id. at 2564; and (5) rejected NTN's argument that zero-priced transactions should be excluded from the margin calculations, id. at 2581-82.
 
 
 4
 On appeal to the Court of International Trade, the court affirmed all but the last finding; the court held that zero-priced transactions were not sales because they were not supported by consideration, and therefore could not be included in the calculation of normal value. NTN Bearing I, 186 F.Supp.2d at 1289. The court remanded for Commerce to exclude these transactions from NTN's sales database. Id. On remand, Commerce excluded NTN's zero-priced transactions from the database, but rejected NTN's argument that it should also exclude those transactions which were not zero-priced but for which the gross unit price plus subsequent billing adjustments equaled zero. The Court of International Trade affirmed. NTN Bearing Corp. of Am. v. United States, No. 98-01-00146, 2002 WL 1877143 (Ct. Int'l Trade 2002) ("NTN Bearing II").
 
 
 5
 NTN and NSK appealed to this court; Timken cross-appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).
 
 ANALYSIS
 A. Standard of Review
 
 6
 With respect to the review of antidumping determinations made by Commerce, we apply the same standard of review as the Court of International Trade: Commerce's final determination is reviewed for substantial evidence on the record and for errors of law. 19 U.S.C. § 1516a(b)(1)(B)(i) (2000); Micron Tech., Inc. v. United States, 117 F.3d 1386, 1393 (Fed.Cir.1997).
 
 
 7
 B. Use of Affiliated Supplier Cost Data and 19 U.S.C. § 1677b(f)
 
 
 8
 In the course of its administrative review, Commerce requested that NSK provide cost data for major inputs received from affiliated parties and used to produce the tapered roller bearings that were the subject of the review. NSK duly provided the data, but protested Commerce's request on the ground that 19 U.S.C. § 1677b(f)(3) permits Commerce to request such data only where it "has reasonable grounds to believe or suspect that an amount represented as the value of [a major] input is less than the cost of production of such input," 19 U.S.C. § 1677b(f)(3) (2000), and Commerce had no such reasonable grounds. Commerce noted that it "had found home market sales below the cost of production (COP) in [its] most recently completed final results for NSK," and conducted a cost test to determine if any of NSK's home market sales in this review were similarly below COP. Based on the result of this test, Commerce used NSK's affiliated supplier cost data to recalculate NSK's total cost of manufacturing ("TCOM"), which the agency then used to recalculate NSK's inventory carrying costs in the United States. Commerce also employed the recalculated TCOM data in determining the difmer adjustment. The agency used this value, which represents differences in physical characteristics between merchandise sold in the United States and that sold abroad, see 19 C.F.R. § 351.411(a) (2003), to control which U.S. and home market tapered roller bearings would be compared: Commerce "used a 20 percent [difmer] cost deviation cap as the maximum difference in cost allowable for similar merchandise." (J.A. 235)
 
 
 9
 NSK challenges Commerce's use of the affiliated supplier cost data to calculate these variables. In particular, NSK argues that Commerce violated 19 U.S.C. § 1677b(f), which permits the use of these data for "purposes of subsections (b) and (e)." Those provisions relate to the calculation of COP and CV, respectively. Citing FAG Italia, S.p.A. v. United States, 291 F.3d 806 (Fed.Cir.2002), NSK argues that the grant of authority to Commerce to use these data for COP and CV calculations implies that Commerce does not have the authority to use the data for other purposes. We disagree.
 
 
 10
 Section 1677b(f) is entitled "[s]pecial rules for calculation of cost of production and for calculation of constructed value." NSK sees in this, together with the reference to "purposes of subsections (b) and (e)" in the statutory text, confirmation that Congress intended the use of affiliated supplier cost data to be limited to these two purposes. The statute does not, however, contain words of restriction limiting the data's use solely to the calculation of COP and CV. NSK thus relies in essence on the maxim expressio unius est exclusio alterius,[1] arguing that the expression of subsections (b) and (e) in section 1677b(f) permits an inference that Congress intended to preclude use of affiliated supplier cost data for any other purpose.
 
 
 11
 In focusing exclusively on section 1677b(f) to the exclusion of the other statutory provisions governing Commerce's actions, NSK stretches this well-worn maxim too far. The maxim is not applied where, inter alia, "its application would thwart the legislative intent made apparent by the entire act." Norman J. Singer, Sutherland Statutes and Statutory Construction § 47:25 (6th ed.2000). We believe that such is the case here.
 
 
 12
 Commerce's calculation of the adjustments at issue in this case is governed only secondarily by section 1677b(f); the agency's authority derives directly from other statutory provisions. Similar merchandise, or "foreign like products" in the terms of the statute, is defined by 19 U.S.C. § 1677(16)(B)(ii) as merchandise "like [the subject] merchandise in component material or materials and in the purposes for which used." Commerce is required to determine what merchandise is a "foreign like product" for purposes of, inter alia, determining normal value. See 19 U.S.C. § 1677b(a)(1)(B)(i) (2000) (defining normal value as "the price at which the foreign like product is first sold"). Similarly, Commerce derives its authority to calculate a difmer adjustment from 19 U.S.C. § 1677b(a)(6), and derives its authority to account for inventory carrying costs from 19 U.S.C. § 1677a(d). Because these statutes provide authority to Commerce to calculate the values in question, we look to the text of these statutes in the first instance for Congress' intent as to how the values are to be calculated. None of these provisions preclude Commerce's use of affiliated supplier cost data in the calculation of these values. NSK's reliance on a maxim of dubious applicability to interpolate restrictions on the use of affiliated supplier cost data into statutes that are silent on the question is unconvincing.
 
 
 13
 Nor is FAG Italia dispositive in this situation. That case involved a statutory grant of authority to Commerce to conduct duty absorption inquiries "during any review ... initiated 2 years or 4 years after the publication of an antidumping duty order." 19 U.S.C. § 1675(a)(4) (2000). Commerce claimed that this provision did not preclude it from conducting a duty absorption inquiry in the second year after the January 1, 1995 "deemed issuance date" of a transition order (i.e., an antidumping order originally issued before the date that the Uruguay Round Agreements Act amendments came into force), which was seven years after the publication of the antidumping duty order in question. FAG Italia, 291 F.3d at 811, 815. We rejected the agency's argument on the grounds that "the absence of a statutory provision cannot be the source of agency authority," id. at 816, and that "statutory provisions governing annual reviews for Commerce do not confer general authority that might include the power to consider duty absorption," id. at 814. However, we recognized that other more general statutory provisions might provide such authority, but we declined to "reach the question whether Commerce might have been authorized to conduct duty absorption inquiries as part of" another provision. Id. at 819.
 
 
 14
 In this case, however, as described above, the authority to calculate the values at issue does not derive from section 1677b(f), but rather from other statutory provisions. Commerce noted that it "does not rely on a respondent's reported costs solely for the calculation of COP and CV," Final Results, 63 Fed.Reg. at 2574, and concluded that it would be distortive to adjust those costs only for those calculations, but not for others in which they were used. Id. ("[I]f we determine a component of a respondent's COP and CV is distortive for one aspect of our analysis, it is reasonable to make the same determination with respect to those other aspects of our margin calculations where we relied on the identical cost data."). We concur with Commerce's analysis and hold that it did not err in interpreting these provisions to permit it to employ affiliated supplier cost data to calculate cost deviations to limit the definition of similar merchandise, the difmer adjustment, and inventory carrying costs.
 
 C. Validity of 19 C.F.R. § 351.407(b)
 
 15
 NTN challenges Commerce's use of available record information to increase the transfer prices of "major inputs" from affiliated suppliers that NTN used to calculate COP and CV, in order to reflect market value. The statutory scheme that governs calculation of cost of production and constructed value is set forth in 19 U.S.C. § 1677b(f):
 
 
 16
 (2) Transactions disregarded
 
 
 17
 A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated.
 
 
 18
 (3) Major input rule
 
 
 19
 If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph (2).
 
 
 20
 Under its authority to administer this statutory scheme, see 19 U.S.C. § 1677(1) (2000), Commerce has formulated a regulatory interpretation under which it uses the highest of transfer price, market value and the affiliated supplier's cost of production: For purposes of section 773(f)(3) of the Act, the Secretary normally will determine the value of a major input purchased from an affiliated person based on the higher of:
 
 
 21
 (1) The price paid by the exporter or producer to the affiliated person for the major input;
 
 
 22
 (2) The amount usually reflected in sales of the major input in the market under consideration; or
 
 
 23
 (3) The cost to the affiliated person of producing the major input.
 
 
 24
 19 C.F.R. § 351.407(b) (1998).
 
 
 25
 NTN maintains that it provided Commerce with both COP and transfer price information and argues that under the "major input rule" set forth in section 1677b(f)(3), Commerce can only resort to information available regarding the COP of an element if Commerce has reason to suspect that the transfer price is less than the affiliated supplier's COP. In NTN's view, "subsection (2) does not ... apply specifically in the case of an affiliated party transaction in which one of the parties has produced a major input for the merchandise under consideration," and therefore is inapplicable to the valuation of major inputs, which is governed solely by subsection (3). NTN states that on the basis of the COP and transfer price information it supplied, Commerce had no basis for a belief that the transfer price was below the COP for many of the inputs, and alternative valuation methods should not have been used for those inputs, in accordance with section 1677b(f)(3).
 
 
 26
 Our review of Commerce's interpretation of these statutory provisions is governed by the two-part inquiry of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, we must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. 2778. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. 2778. Where Congress has delegated authority to the agency to promulgate regulations elucidating statutory provisions, the resulting regulations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Id. at 844, 104 S.Ct. 2778.
 
 
 27
 The statutory scheme is not a model of clarity, particularly with respect to the question of the applicability of subsection (2) to the valuation of major inputs. We must therefore determine whether Commerce's interpretation of the statute is permissible. See id. at 843, 104 S.Ct. 2778. NTN seeks to persuade us that it is not; according to NTN, subsection (2) is simply inapplicable here, and if the transfer price is greater than the cost of production, that transfer price must be accepted as the valuation for the major input. The statute does not compel the construction that NTN forces upon it. Section 1677b(f)(3) itself references subsection (2). See 19 U.S.C. § 1677b(f)(3) (mandating the use of COP for the valuation of major inputs "if such cost is greater than the amount that would be determined for such input under paragraph (2)"). This suggests subsection (2) is of no applicability in considering the valuation of major inputs. Rather, it is reasonable to conclude that where the transfer price is less than market value, per subsection (2), or the cost of production, per subsection (3), the transfer price is abandoned in favor of the higher of those two values. Commerce's interpretation of the statute, under which it simply uses the highest value among the transfer price, market value, and cost of production, is neither arbitrary, capricious, nor manifestly contrary to the statute, see Chevron, 467 U.S. at 844, 104 S.Ct. 2778, and we accordingly affirm that interpretation.
 
 
 28
 D. Use of "Facts Available" Under 19 U.S.C. § 1677e
 
 
 29
 NTN criticizes Customs for its reliance on facts available, in the form of a sample of affiliated-party inputs, "to increase the manufacturing costs of the control numbers NTN identified as including related-party inputs." Final Results, 63 Fed.Reg. at 2573. NTN argues that because Commerce never requested information that allowed the agency to identify the bearing models that used particular inputs, "NTN cannot be penalized for not providing that information." In other words, it is NTN's view that Commerce may not resort to facts otherwise available if it could have asked parties for data that would directly address the questions Commerce seeks to answer. NTN also attacks Commerce's use of facts available, in the form of the total billing adjustment in Commerce's home market verification report, to adjust its reported home market billing adjustments. See id. at 2563. NTN maintains that neither instance of Commerce's resort to facts available comports with the "guidelines" for the use of facts available that NTN states are set forth in 19 U.S.C. § 1677e(a)(2).
 
 
 30
 NTN's arguments are precluded by the current text of 19 U.S.C. § 1677e(a), which controls when Commerce may resort to facts available. Since the revision of this provision in 1994, see Uruguay Round Agreements Act, Pub.L. No. 103-465, § 231(c), 108 Stat. 4809, 4896 (1994), it has read as follows:
 
 
 31
 (a) In general
 
 
 32
 If —
 
 
 33
 (1) necessary information is not available on the record, or
 
 
 34
 (2) an interested party or any other person —
 
 
 35
 (A) withholds information that has been requested by the administering authority or the Commission under this subtitle,
 
 
 36
 (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
 
 
 37
 (C) significantly impedes a proceeding under this subtitle, or
 
 
 38
 (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,
 
 
 39
 the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.
 
 
 40
 19 U.S.C. § 1677e(a) (2000). The plain language of this statute allows the use of facts available when "necessary information is not available on the record." Id. § 1677e(a)(1). There is no requirement that Commerce first request specific information, much less a restriction of Commerce's ability to use facts available to those types of information about which it specifically inquired. All that is required is that the necessary information be unavailable on the record. NTN would have us resurrect the pre-1994 version of this provision, which provided that "the administering authority shall, whenever a party refuses or is unable to produce information requested in a timely manner and in the form required ... use the best information available." 19 U.S.C. § 1677e(c) (1988) (emphasis added). We are without power to do so, even were we so inclined.
 
 
 41
 For the same reason, we reject NTN's argument that the circumstances set forth in 19 U.S.C. § 1677e(a)(2) represent the only situations in which Commerce may resort to facts available. The post-1994 version of the statute permits the use of facts available when necessary information is not available on the record. See 19 U.S.C. § 1677e(a)(1) (2000). We are required to construe a statute so as to give meaning to all of its provisions, see Meeks v. West, 216 F.3d 1363, 1367 (Fed.Cir.2000), and decline to read this provision as if subsection (a)(1) did not exist. It appears, furthermore, that the necessary information was not available on the record in either case. See Final Results, 63 Fed.Reg. at 2563 ("[B]ecause the record provides no information as to which transaction-specific billing adjustments are accurate... we have relied on facts available to correct NTN's reported home market billing adjustments."); id. at 2573 ("NTN could not explain the difference between the transfer price and the market price. Thus, for the preliminary results we used the results of our samples to increase the manufacturing costs of the control numbers NTN identified as including related-party inputs."). NTN has not demonstrated that Commerce's resort to facts available was unsupported by substantial evidence or not in accordance with law.
 
 
 42
 E. Inclusion of Transactions Adjusted to Zero Price
 
 
 43
 In its 2002 judgment, the Court of International Trade remanded to Commerce to "exclude any transactions that were not supported by consideration from NTN's United States sales database." NTN Bearing I, 186 F.Supp.2d at 1289. The court's remand was based on our holding in NSK Ltd. v. United States, 115 F.3d 965 (Fed.Cir.1997), that transactions had to be supported by consideration in order to be considered sales. See id. at 975. On remand, Commerce removed only "those sales where the gross unit price equaled zero before the deduction of any post-sale price adjustments." Commerce found "no evidence on the record suggesting that those sales which were in effect zero-priced due to post-sale billing adjustments lacked consideration." The Court of International Trade affirmed, holding that
 
 
 44
 a zero-priced sale (that is, a transaction made inherently for no consideration) is a form of business dealing that is entirely different in nature from a sale where the gross unit price plus billing adjustments equaled zero (that is, a transaction made for a consideration that was eventually offset by an adjustment given for certain business reasons).
 
 
 45
 NTN Bearing II, 2002 WL 1877143, at *1.
 
 
 46
 NTN argues that Commerce also should have excluded those transactions in which the gross unit price plus billing adjustments equaled zero, but admits that the billing adjustments that offset the non-zero gross unit price of these transactions were subsequent to the transactions. However, Commerce found that "merchandise sold at a price greater than zero did not constitute sample sales and, thus, did not lack consideration." NTN does not provide us with any basis to conclude that the billing adjustments were contemplated when the sales were made. Retroactive adjustments in the gross unit price, even where they perfectly offset the original gross unit price and leave the seller with no net income, cannot alter the consideration present in the original transaction. See Restatement (Second) of Contracts § 79 (1979) ("If the requirement of consideration is met, there is no additional requirement of ... a gain, advantage or benefit to the promisor."). NTN has not demonstrated that Commerce's finding that these transactions should be included in NTN's sales database was unsupported by substantial evidence.
 
 F. Attribution of Warehousing Expenses
 
 47
 Finally, Timken argues that Commerce removed warehousing expenses attributable to NTN's non-scope merchandise from the pool of allocated expenses, and that this resulted in a distortion of the size of the pool of expenses and inappropriately reduced the dumping margin. Instead, Timken requests us to direct Commerce to include non-scope warehousing expenses in the pool of expenses to be allocated. We perceive no reason to include warehousing expenses that Timken itself admits are attributable to merchandise outside the scope of Commerce's review. Timken has not established that Commerce's methodology is unsupported by substantial evidence.
 
 CONCLUSION
 
 48
 Commerce's final determination was supported by substantial evidence and not erroneous as a matter of law. We accordingly
 
 
 49
 
 AFFIRM.
 
 
 
 
 Notes:
 
 
 [1]
 Meaning that "the expression of one thing is the exclusion of another."Cook v. Principi, 318 F.3d 1334, 1349 n. 6 (Fed.Cir.2002) (en banc) (quoting Harris v. Owens, 264 F.3d 1282, 1296 (10th Cir.2001)).